IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **STEPHAN BREEDLOVE,** | Case Number 4:13 CV 077 |
| Petitioner, | Judge Jeffrey J. Helmick |
| v. | REPORT AND RECOMMENDATION |
| **RHONDA RICHARD,** Warden | |
| Respondent. | Magistrate Judge James R. Knepp II |

### INTRODUCTION

*Pro se* Petitioner Stephan Breedlove, a prisoner in state custody, filed a petition seeking a writ of habeas corpus under 28 U.S.C. § 2254 ("Petition"). (Doc. 1). Respondent Warden Rhonda Richard filed a Return of Writ (Doc. 6) with attached exhibits. Petitioner did not file a reply.

The district court has jurisdiction over the Petition under § 2254(a). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(2). (Non-document entry dated January 14, 2013). For the reasons discussed below, the undersigned recommends the Petition be dismissed.

### FACTUAL BACKGROUND

For purposes of habeas corpus review of state court decisions, findings of fact made by a state court are presumed correct and can only be contravened if the habeas petitioner shows, by clear and convincing evidence, that the state court's factual findings were erroneous. 28 U.S.C § 2254(e)(1); *Moore v. Mitchell*, 708 F.3d 760, 775 (6th Cir. 2013); *Mitzel v. Tate*, 267 F.3d 524, 530 (6th Cir. 2001). This presumption of correctness applies to factual findings made by a state

1

court of appeals based on the state trial record. *Mitzel*, 267 F.3d at 530. On direct appeal, the Ohio Sixth District Court of Appeals set forth the following facts in this case:

> On November 23, 2003, 16-year-old James Revere, aka Spreewell, was shot five times and killed at the intersection of Hayman and Covington Streets on the north side of Youngstown. Witnesses implicated Breedlove, Glenn Scott, and Keon Richardson in the shooting.
>
> According to eyewitnesses, Revere was spotted driving down Covington Street. Breedlove and his co-defendants were seen driving up and down nearby Griffith Street and then eventually witnesses spotted them at the corner of Hayman and Covington Streets. Scott was named as the driver with Breedlove and Richardson as his passengers. At least two, and possibly all three men, opened fire on Revere while he was still in his car. The three then fled the scene.
>
> On December 4, 2003, a Mahoning County grand jury indicted Breedlove by direct presentment, jointly with Scott and Richardson, on one count of aggravated murder, a first-degree felony in violation of R.C. 2903.01(A), (F) and R.C. 2929.03(A)(1) with a firearm specification in violation of R.C. 2941.146(A).
>
> \* \* \*
>
> At trial, three eyewitnesses testified against Breedlove -- Anita Marshall, Ariel Brown, and Kenneth Findley.
>
> Anita Marshall testified that on the morning of the shooting she was at Ariel Brown's, her sister, apartment on Griffith Street. The two were standing outside with some other girls when they noticed a burgundy car drive slowly by and later saw the same car drive up Griffith Street. (Tr. 574, 576). Marshall recognized the people in the car as Breedlove, Scott, and Richardson. (Tr. 574).
>
> Marshall stated that she knew all three men from going to school together and "around the neighborhood." (Tr. 575). She stated that Scott was the driver, Breedlove was on the passenger side, and Richardson was in the backseat. (Tr. 574-75).
>
> Marshall stated that the girls also recognized another car. She stated that they saw a car, which she identified as Sholanda Bohazi's car, driving down Covington Street. (Tr. 577). At that time, Marshall stated that Breedlove's car was at the corner of Covington and Madison Streets and she saw it turn onto Covington Street. (Tr. 577-78). Marshall stated that Brown then took off running towards the two cars because Brown thought her ex-boyfriend was the one driving Bohazi's car. (Tr. 578-79). Marshall stated that she followed her sister and that was when the shooting started. (Tr. 579-80). Marshall stated that from her view on Covington where she was standing on the bridge, she saw Breedlove and

2

Richardson shooting. (Tr. 580-81). She stated that although there is a guardrail and a fence on the bridge, she could see everything clearly. (Tr. 640). She indicated the victim has backed the car he was driving into a pole in what appeared an attempt to get away. (Tr. 581).

Marshall testified that Breedlove and Richardson then got out of the car. (Tr. 581). She testified that Breedlove was still shooting at this time but remained close to the car he had been riding in. (Tr. 581-82). Richardson, she stated, walked towards Revere, who was still in Bohazi's car, and continued shooting at him. (Tr. 582). After they stopped shooting, Marshall stated that she saw either Breedlove or Richardson drop a Black & Mild cigar and a lighter on the ground, which was a sign of disrespect to the victim's mother. (Tr. 582, 591). Marshall stated that they then got back in their car and left the scene, again with Scott driving. (Tr. 582-83).

Marshall testified that a police officer came to her house a few days later with two photo arrays for her to look at. (Tr. 585). Out of the first photo array she identified Richardson and out of the second array she identified Scott as being two of the people she saw shooting at Revere. (Tr. 587). Marshall stated that the police did not show her a photo array with appellant's picture in it. (Tr. 587).

On cross-examination, Marshall stated that she physically saw appellant get out of the car and fire a gun. (Tr. 633). However, she admitted that she never told Detective Daryl Martin this fact when he questioned her. (Tr. 633-34). Marshall stated she never told Detective Martin because he never asked. (Tr. 634). She admitted that she told him that Richardson got out of the car because that is who Detective Martin asked her about. (Tr. 659). Additionally, Marshall admitted that although she testified that she "saw" Breedlove fire shots, she "assumed" he was firing because she heard the shots. (Tr. 660). Finally, Marshall admitted that her focus at that time was on her sister because she was worried about her. (Tr. 629, 659-60).

Ariel Brown's testimony was the same as Marshall's regarding where the girls were and the two cars they saw. (Tr. 665-67). She too identified Breedlove, Scott, and Richardson and stated that Scott was the driver, Breedlove was in the front passenger seat and Richardson was in the back seat on the driver's side. (Tr. 667). Brown stated that she knew the men prior to this incident from growing up around them. (Tr. 668). Brown indicated that she thought her ex-boyfriend, Raymond Hammond, was driving the second car. (Tr. 670). She also thought it was suspicious that Breedlove, Scott, and Richardson were in the Westlake Project area. (Tr. 670-71). For this reason, Brown stated that she ran after the car she thought Hammond was driving. (Tr. 670-71).

When she approached the end of the bridge on Covington by Madison, Brown stated that she heard gunshots. (Tr. 671-72). She indicated that Revere was on Hayman Street close to Covington Street by this time and the defendants' car was

3

at the corner of Hayman and Covington Streets. (Tr. 671). Brown testified that she first saw and heard gunfire coming from the car that Scott was driving. (Tr. 672-73). At that time, Brown stated that the gunfire was only coming from the passenger side of the car where Breedlove was seated. (Tr. 673). She stated that Breedlove was firing a weapon. (Tr. 674). Brown testified that she then saw Richardson exit the defendants' car, run up to the car that Revere was in, and shoot into it. (Tr. 673). Brown stated that Scott was the driver the entire time. (Tr. 674-75).

Brown testified that she went to the police station that day. At the police station, she was shown three photo arrays. Brown stated that she picked Breedlove, Scott, and Richardson out of the photo arrays. (Tr. 680).

On cross-examination, Brown admitted to some inconsistencies among her testimony, a statement that she gave to police, and testimony she gave at a motion to suppress hearing. The inconsistencies dealt with why she started running towards the car Revere was driving, where she was standing when she first heard shots fired, the fact that she did not write in her statement that she saw Breedlove shooting, and the fact that she wrote in her statement that she saw one person, Richardson, get out of the car but she testified at the suppression hearing that she saw two people get out of the car. (Tr. 723-31).

Kenneth Findley was the third eyewitness to testify. He stated that on the day in question he left church and was driving on Covington Street towards Hayman Street when he heard shots being fired. (Tr. 817). He indicated that he saw one car back up into a pole and a burgundy car approach it. (Tr. 817). Findley stated that three people were in the burgundy car and that at least two of them were shooting. (Tr. 818). He testified that it seemed that the person in the backseat was shooting and that the person in the front passenger seat was shooting. (Tr. 819). Findley stated that when the burgundy car stopped, the person in the backseat got out and fired more shots at the car that had backed into the pole. (Tr. 823).

Findley stated that he saw the three men in the car but did not get a good look at them. (Tr. 827). He also stated that he knew who Breedlove, Scott, and Richardson were prior to the shooting. (Tr. 827). Next, Findley testified that Detective Martin brought a photo array to his house. (Tr. 827). Findley stated that he picked Breedlove's photo out of the array because he thought Breedlove was the man in the front passenger side of the car. (Tr. 828). However, Findley admitted that he was not sure if it was Breedlove he saw. (Tr. 828, 857). Findley also admitted that when he first talked with police, he indicated that he could not identify any of the men he saw in the car. (Tr. 836).

In addition to the above eyewitness, the state called numerous other witnesses whose testimony was relevant. Sholanda Bohazi, the owner of the car that Revere was driving, testified that she and Revere were friends. She stated that the night before the murder, Revere had spent the night at her house. (Tr. 748). Around

4

noon the next day, Bohazi stated, Revere used her car to drop off her nephew at her mother-in-law's house. (Tr. 749). After dropping off her nephew, Bohazi stated, Revere called her and told her that he was at "some dude house" and that he sounded scared and upset. (Tr. 751). Bohazi testified that Revere told her that he was being followed by Breedlove, Scott, and Richardson. (Tr. 763). Bohazi stated that approximately five minutes later she received a phone call that Revere had been shot. (Tr. 763-64).

Bohazi also testified that in the week prior to his death, Revere received a threat from Breedlove. (Tr. 755-56). She stated that Breedlove had left a message on Revere's pager, which he played for her, stating something to the effect of "he was gonna kill him" because of who he was "hanging with," which was Bohazi's brother-in-law. (Tr. 756). Bohazi stated that she recognized Breedlove's voice on the message. (Tr. 756). She stated that she knew Breedlove from going to school with him. (Tr. 754).

On cross-examination, Bohazi admitted that although she knew Breedlove, she had not had conversations with him or spoken with him on the telephone. (Tr. 774). Additionally, Bohazi admitted that she did not volunteer any information to police on the day of the shooting. (Tr. 777-78).

Regarding physical evidence found at the scene, Detective Martin testified that shell casings and a blunt type of cigar were found at the scene. (Tr. 968). Officer Robert Mauldin's testimony offered further testimony concerning the casings. He indicated that casings from two different weapons were found at the scene. (Tr. 875). However, he testified that some of the casings had been moved from their original positions. (Tr. 955). The casings that had been moved were 9mm and the others were .380mm. (Tr. 875). Jonathan Gardner, a firearms examiner for the Bureau of Criminal Identification and Investigation (BCI), testified that all of the 9mm casings had come from the same gun and all of the .380mm casing had come from the same gun. (Tr. 928, 931). He also testified that the bullets found in Revere's body and in his car were .380mm. (Tr. 932). Melissa Zielaskiewicz, a forensic scientist in the serology DNA section at BCI, offered further testimony regarding the cigar. She concluded that DNA found on that cigar belonged to Richardson. (Tr. 1082-83).

Finally, Robert Belding, the deputy coroner, testified that Revere's cause of death was hypovolemic shock due to a gunshot wound to the torso. (Tr. 1139). All of the above establishes that Breedlove was involved in the murder of Revere. While there may be some discrepancies between the eyewitnesses' testimony, two of the eyewitnesses, Marshall and Brown, positively identified Breedlove, Scott and Richardson. The fact that each of these witnesses knew Breedlove and his co-defendants indicates that they would be less likely to misidentify them than someone who did not know them. Likewise, DNA evidence found on the cigar at the scene was a match for Richardson's DNA. This substantiated Marshall and Brown's identification of him and demonstrated that each had sufficient

5

opportunity to view the men in the car. Furthermore, other evidence corroborated their identification of Breedlove. For instance, although Findley was not sure if it was Breedlove that he saw in the car, he thought it might be. Also, according to Bohazi, minutes before his death, Revere told her that Breedlove, along with Scott and Richardson, were following him. Furthermore, she testified that in the week prior to the shooting, Breedlove had threatened Revere.

Additionally, the evidence indicates that Breedlove was one of the shooters. Marshall and Brown indicated that he was shooting at the victim's car. Findley additionally stated that a person in the passenger front seat was shooting. Marshall and Brown indicated that Breedlove was in the front passenger seat of the car.

Consequently, given this evidence, we cannot find prejudice. The evidence of guilt is overwhelming.

### PROCEDURAL BACKGROUND

### State Conviction

On December 4, 2003, a Mahoning County Grand Jury indicted Petitioner on one count of aggravated murder with a firearm specification. (Ex. 1, Doc. 6-1). Prior to the jury trial, Petitioner, through counsel, filed a motion for relief from a prejudicial joinder. (Ex. 3, Doc, 6-1). The trial court overruled the motion. (Ex. 5, Doc. 6-1).

After a jury trial, Petitioner was found guilty of aggravated murder with a firearm specification. (Ex. 6, Doc. 6-1). On June 9, 2005, Petitioner was sentenced to a term of life imprisonment with parole eligibility after 20 years and 5 years on the firearm specification to be served prior to and consecutive to the sentence for aggravated murder. (Ex. 7, Doc. 6-1).

### Direct Appeal

Petitioner, through counsel, timely appealed to the Seventh District Court of Appeals, Mahoning County, Ohio. (Ex. 9, Doc. 6-1). Petitioner set forth the following assignments of error:

1. The prejudicial joinder of two or more defendants violates the Sixth and Fourteenth Amendments to the United States Constitution and Art. I § 10 of the Ohio Constitution.

> 2. The due process clause of the United States Constitution is violated when a defendant is convicted on unreliable eyewitness identification.

(Ex. 10, Doc. 6-1). On October 1, 2007, Petitioner, through different appellate counsel, filed a motion for leave to supplement the assignments of error. (Ex. 12, Doc. 6-1). The motion was granted and Petitioner asserted the following additional assignment of error:

> 3. Appellant and the public were denied a public trial when the trial court closed the courtroom in contravention of U.S. Const. Amend. VI and XIV and Ohio Const. Art. I, §§2, 10, and 16.
>
> <u>First Issue Presented for Review</u>: Must a trial court conduct a reasonable investigation before closing a trial to the public, and explore options less restrictive than complete closure?
>
> <u>Second Issue Presented for Review</u>: Absent such investigation and findings, must a case be reversed when the courtroom is closed to the public?
>
> <u>Third Issue Presented for Review</u>: Is mere nervousness or apprehension on the part of a prospective witness, without more, sufficient to justify closure of the public trial in contravention of U.S. Const., Amend. VI and XIV and Ohio Const., Art. I, §10?

(Ex. 14, Doc. 6-1).

On March 17, 2008, the Court of Appeals affirmed the judgment of the trial court. (Ex. 16, Doc. 6-1). Petitioner, through his appellate counsel, filed an appeal of the Seventh District Court of Appeals' Opinion to the Ohio Supreme Court. (Ex. 17, Doc. 6-1). In his memorandum in support of jurisdiction, Petitioner asserted the following proposition of law:

> I. A witness called by the state in a joint trial is a witness "against" all defendants.

(Ex. 18, Doc. 6-1). On July 30, 2008, the Ohio Supreme Court denied leave to appeal and dismissed the appeal "as not involving any substantial constitutional question." (Ex. 20, Doc. 6-1).

**Motion For New Trial**

On February 11, 2011, Petitioner, through counsel, filed a motion for a new trial. (Ex. 21, Doc. 6-1). The motion for a new trial was based on an affidavit from a State witness Larese Jones dated May 16, 2010, in which he claimed his testimony was coerced by the prosecution. (Ex. 21, Doc. 6-1). The State filed a response opposing a new trial. (Ex. 22, Doc. 6-1). On July 21, 2011, the trial court overruled Petitioner's motion for a new trial. (Ex. 23, Doc. 6-1). Petitioner moved to strike the State's response as untimely and sustain his motion. (Ex. 24, Doc. 6-1). On January 12, 2012, the trial court again overruled the motion for a new trial. (Ex. 25, Doc. 6-1). There was no appeal.

## FEDERAL HABEAS CORPUS

Petitioner, through appellate counsel, filed the instant petition for a writ of habeas corpus that was received by the court on January 11, 2013. His ground for relief is as follows:

> GROUND ONE: Argument in Support: Petitioner submits that he is innocent of crimes for which he was convicted and that said conviction has resulted in a miscarriage of justice. Moreover, Petitioner states that his application for writ of habeas corpus is timely filed pursuant to 28 U.S.C Section 224(d) as the facts supporting his claim only recently became available to him through due diligence. These facts were put before the trial court in a motion for a new trial which was overruled thus, exhausting all of Petitioner's State remedies.
>
> Petitioner was convicted after trial to jury as stated above. The most compelling piece of evidence against him was the testimony of Larese Jones. Mr. Jones testified that Stephan Breedlove offered him a confession to each and every allegation contained in his indictment. This evidence was particularly harmful considering the lack of other evidence demonstrating Defendant's role in the offenses in question.
>
> However, on or about May 16, 2010 Petitioner's mother was presented with the affidavit of Larese Jones. In his affidavit Mr. Jones testified that he was presented with a version of events that he was instructed to testify to. He states he "was coached," by the Prosecution and their lead investigator. He also states that he was threatened with the loss of freedom if he failed to testify to the version of events presented by the Prosecution. His addiction to heroin caused him to do whatever was necessary to remain free from incarceration and close to heroin,

8

according to him. Petitioner asserts that this rises to the level of the "truly persuasive" showing of innocence contemplated in Herrera v. Collins, 506 U.S. 390, 417 (1993). Moreover, the signed affidavit of a key witness who has admitted to perjury where very little other evidence exists, rises to the level of "extraordinarily high," as contemplated by the United States Supreme Court in *Herrera v. Collins*, 506 U.S. 390, 416 (1993). The affidavit evidence renders it is more likely than not that no reasonable juror would have found the Petitioner guilty beyond a reasonable doubt. *Schlup v. Delo*, 513 U.S. 298 (1995).

(Doc. 1).

## DISCUSSION

The Court finds two arguments in Petitioner's one ground for relief. First, he argues his Petition should be considered timely filed pursuant to 28 U.S.C. 2254(d)(1)(D) because "the facts supporting his claim only recently became available to him through due diligence." (Doc. 1). Next, Petitioner claims actual innocence based on Larese Jones' affidavit. (Doc. 1).

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), there is generally a one-year period in which a prisoner in state custody may file a petition for habeas relief in federal court. Here, the Petition was not filed within the one-year statute of limitations. (*See* Doc. 6, at 15-17). Nevertheless, Petitioner argues he is entitled to a new AEDPA start date pursuant to Title 28 U.S.C. §2244(d)(1)(D) which provides for an alternative later AEDPA start date based on the date the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

Even accepting that Petitioner can surmount this procedural time-bar pursuant to § 2244(d)(1)(D), his claim ultimately fails because he has not alleged a Constitutional violation. 28 U.S.C. § 2254(a) (a petitioner must challenge the legality of custody on the ground it is, or was imposed, "in violation of the Constitution or laws or treaties of the United States."); *Smith v. Morgan*, 371 F. App'x 575, 582 (6th Cir. 2010) (citing 28 U.S.C. § 2254(a)) ("[t]he writ of habeas corpus is not available to remedy errors of only state law."); *see also Norris v. Schotten*,

9

146 F.3d 314, 328 (6th Cir. 1998) ("[a] claim based solely on an error of state law is not redressable through the federal habeas process.") (quoting *Estelle v. McGuire*, 502 U.S.62, 67–68 (1991)).

Moreover, Petitioner's main argument, that he is actually innocent based on Larese Jones' affidavit, fails for the same reason. "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993). "This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution – not to correct errors of fact." *Id*. Simply put, Petitioner has not alleged an independent Constitutional violation. Indeed, the Petition is void of any Constitutional claim. Because he has not claimed an independent Constitutional violation, his claim for actual innocence must fail.

## CONCLUSION AND RECOMMENDATION

Following review, the undersigned recommends the Court dismiss the Petition with prejudice.

s/James R. Knepp II<br>
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).